## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BRENDA SALTER, as** | ) | |
| **administratrix for the Estate of** | ) | |
| **William Scott Salter,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 12-0174-CG-N** |
| | ) | |
| **ELAINE STINSON BOOKER, as the** | ) | |
| **administratrix for the Estate of** | ) | |
| **Edwin Booker, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' motion for summary judgment (Doc. 167), Plaintiff's response in opposition (Doc. 179), and Defendants' reply (Doc. 190). For reasons that will be explained below, the Court finds that the motion for summary judgment should be granted in part to the extent that summary judgment will be granted in favor of Chief Deputy Sheriff Tyrone Boykin and Elaine Stinson Booker as the administratrix for the Estate of Sheriff Edwin Booker. Defendants' motion for summary judgment will be denied as to Wilbur Mitchell, Shirley Trent and Alisha Pate.

### FACTS

This case involves § 1983 and state law wrongful death claims relating to the suicide death of William Scott Salter ("Salter" or "Mr. Salter"), in March 2010, while

he was detained at the Conecuh County Detention Facility in Alabama. The Amended Complaint alleges that Defendants were deliberately indifferent to Mr. Salter's serious medical needs during his detention in violation of his rights as a pretrial detainee under the Fourteenth Amendment to the U.S. Constitution and Alabama law. (Doc. 87).

There are five defendants remaining in this action, Tyrone Boykin, Wilbur Mitchell[1], Shirley Trent, Alisha Pate[2] and Elaine Stinson Booker as the administratrix for the Estate of Edwin Booker. Edwin Booker was the Sheriff of Conecuh County, Alabama at the time of Salter's detention and suicide. Tyrone Boykin was the Chief Deputy Sheriff of Conecuh County. (Doc. 169-4, p. 13). Wilbur Mitchell was the Jail Administrator of the Conecuh County Jail. (Doc. 169-1, p. 4). Captain Shirley Trent was a corrections officer. (Doc. 169-6, p. 6). Alisha Pate worked as both a dispatcher for the sheriff's office and as a corrections officer for the jail. (Doc. 169-5, p. 5).

In the year before Salter's suicide, on August 31, 2009, Salter was arrested and charged with reckless endangerment and brought to the Conecuh County Detention Facility. (Doc. 180-1, p. 93). By Probate Court Order dated September 1, 2009, on the petition of Mrs. Brenda Salter, Mr. Salter was committed on an emergency basis to be confined at Crenshaw Community Hospital. (Doc. 182-7).

---

[1] Mr. Mitchell was identified in the Amended Complaint as "M.A. Mitchell" but Defendants report that his correct name is Wilbur Mitchell.
[2] Alisha Pate was identified in the Amended Complaint as "Alisha Brown" but she was married in 2014 and became Alisha Pate. (Doc. 169-5, pp. 3-4).

Salter was then committed to outpatient treatment at Southwest Alabama Mental Health by order dated September 10, 2009. (Doc. 169-1, p. 145; Doc. 182-6).

On February 8, 2010, a police report indicates that Salter called 911 to report that he had been robbed and stabbed. (Doc. 185-4).  The police report narrative notes that Salter has a history of wanting to commit suicide and suggests that the wound may have been self-inflicted. (Doc. 185-4).   The report states that Mental Health was notified and said they would send someone to the hospital to talk with him.

On February 25, 2010, less than two weeks before his suicide, Salter reportedly called the Conecuh County Sheriff's Office saying he had a gun and that he was going to put it in his mouth and pull the trigger. (Doc. 169-9, pp. 22-24). While the dispatcher kept Salter on the phone, another dispatcher arranged to have Salter's brother go over and calm him down and get the guns away from him. (Doc. 169-9, p. 24-25).   Two Conecuh County deputy sheriffs were sent to Salter's home. (Doc. 169-9, p. 25).  Salter's mental health counselor, Kevin Bryant, was called and Chief Boykin was advised of the situation. (Doc. 169-9, pp. 23-24, 33).  The dispatcher did not speak to Sheriff Booker or Administrator Mitchell about the incident. (Doc. 169-9, p. 32).  Salter was taken to see Kevin Bryant who talked to Salter for a while and then told him to go home and come back tomorrow to see him. (Doc. 169-13, pp. 43-44).  Salter was a client of Southwest Alabama Mental Health and Kevin Bryant had previously had contacts with him as a counselor. (Doc. 169-

12, p. 18).  Kevin Bryant did not seek to have Salter committed at that time because Salter stated that he would not hurt himself and that he was not having any current thoughts of suicide and because there was no paranoia or psychosis evident at that time. (Doc. 169-12, pp. 73-74).

On March 1, 2010, William Scott Salter was arrested on a felony warrant for unlawful breaking and entering a vehicle in relation to the reported theft of a Remington 12-gauge shotgun from a pickup truck. (Doc. 169-15, ¶¶ 2-3; Doc. 169-28, p. 3).  Salter was placed in the Conecuh County Detention Facility under a $50,000.00 bond. (Doc. 169-15 ¶ 4).  During booking, Salter informed the booking officer that he had mental problems, he suffered from depression, and took medications for pain and mental problems. (Doc. 169-10, pp. 21-25).  Salter's medical booking form notes that he has mental problems explained as "depression", he has seizures every now and then, he is taking medication for "pain, mental, blood pressure, chlosterol(sic), nerves etc.", he has a heart condition described as "micro valve prolapse", and that he is suicidal "sometimes (tried killin (sic) himself twice)." (Doc. 169-29 p. 2).  According to the booking officer, Salter was initially placed on suicide watch because Salter said he was sometimes suicidal and had tried to kill himself in the past. (Doc. 169-10, p. 29).  Administrator Mitchell reports that he was unaware of Salter's February 25th 911 call and only knew of the information on Salter's booking sheet. (Doc. 169-1, pp. 127-128).  According to Nurse Johnson, she was not specifically aware of the recent suicide attempt, but "everyone knew", including Mitchell, "because the deputies had gone out there on numerous

4

occasions." (Doc. 169-7, p. 85).

Detainees on "suicide watch" are not given any linens, bed sheets or clothing other than boxer shorts and are visually checked by a jailer every 15 minutes. (Doc. 169-1, pp. 64-65). A detainee on suicide watch would have a piece of paper put on the cell door, and every 15 minutes a jailer would look in on the detainee and sign the paper. (Doc. 169-1, p. 66).

Plaintiff asserts in her response in opposition to summary judgment that Salter was never placed on suicide watch. However, Defendants point out that Plaintiff's Amended Complaint alleges that "[u]pon his arrest, the defendants placed Mr. Salter in an isolation cell in the booking room and he was placed on suicide watch which was limited to a 24-hour period." (Doc. 87, ¶ 21). This does not appear to be an admission of any real substance though, because the Amended Complaint further alleges that no special precautions were taken to remove any items that a reasonable person would expect posed a danger to a suicidal detainee. (Doc. 87, ¶ 21). The Amended Complaint also states that "[i]n the alternative, he was originally placed on 'suicide watch' and treated in a manner that recognized the danger he posed to himself, but was thereafter removed from said 'watch.' " (Doc. 87, ¶ 21). Thus, Plaintiff cannot now say that Salter was not at least initially put on "suicide watch," but the allegations of the complaint leave open the possibility that even though he was considered to be on "suicide watch" initially, all items that might pose a danger to a suicidal detainee may not have been removed from Salter's

cell during that time.   The jail administrator, Wilbur Mitchell agreed that Salter was put in an isolation cell originally because all new people in the jail are put in the isolation cell. (Doc. 169-1, p. 51).  "In a normal situation" he would have been moved to the general population the next day. (Doc. 169-1, p. 52).  In the isolation cell, Salter would have had a mat, but nothing else. (Doc. 169-1, p. 53).  Inmates stating they are suicidal are automatically put into one of three cells at the front of the jail in the booking area and remain on suicide watch until removed by the jail doctor. (Doc. 169-6, pp. 66-68).  Only Dr. West could take an inmate off suicide watch. (Doc. 169-6, p. 63; Doc. 169-7, p. 18).

Salter was later seen by Dr. West who reportedly decided Salter did not need to be on suicide watch, but should be placed on "health watch." (Doc. 169-1, pp. 62, 64).  Dr. West worked for Tri-County Medical Center and was a medical doctor, not a mental health doctor, but when Dr. West made suggestions on treatment, the jail administrator and staff did what he asked. (Doc. 169-1, pp. 63-64; Doc. 169-7, pp. 18-20).  It was Tri-County's policy for the doctor to classify inmates' mental health and call in mental health for a second opinion. (Doc. 169-7, p. 21).

The Alabama County Jail Standards required jail personnel to be aware of certain indicators that may be potentially suicidal indicators. (Doc. 169-3, p. 29). Under the County Jail Standards, the booking officer is required to complete a health screening form and ask if the arrestee has had a history of suicide attempts. (Doc. 169-3, p. 30).  If there was a history of suicide attempts, the Jail Standards

required the inmate to be put on suicide watch and not issued his blankets or clothing. (Doc. 169-3, p. 31).  Additionally, a history of suicide or unusual behavior should be immediately brought to the attention of the shift supervisor or the jail administrator. (Doc. 169-3, p. 31).  The Alabama County Jail Standards also required that the inmate be referred to the local mental health agency as soon as possible, that the referral be documented and the officer making the referral should request a face-to-face evaluation of the inmate by the mental health professional as soon as possible. (Doc. 169-3, pp. 32-33).  Correctional officers had copies of the Alabama County Jail Standards in their policy and procedure manuals. (Doc. 169-3, pp. 28-29).  The Conecuh County "Guidelines and Policy for Jail Administration and Procedures" also stated that for "all arrestees who are considered to be suicidal a the time of booking", "[a]n immediate referral will be made to the local mental health center and a face to face interview by a mental health professional will be requested." (Doc. 183-7, p. 54).  Under the Guidelines, the referral was required to be made before the arrestee is place in a housing unit and the booking officer was to "carry out the instructions of the mental health agency to help ensure the safety of the arrestee. (Doc. 183-7, p. 48).

The local mental health agency was Southwest Alabama Mental Health Agency and Salter's therapist there was Kevin Bryant. (Doc. 169-7, p. 43).  On March 1, 2010, the day Salter was arrested, the jail nurse, Monica Johnson, was informed that Salter had been placed on suicide watch and she called Mr. Bryant. (Doc. 169-7, pp. 28-29, 44).  When an inmate exhibited strange behavior or there

was concern about an inmate's mental health, the jail personnel would call Kevin

Bryant and he would go to the jail and assess the inmate. (Doc. 169-12-p. 14). Nurse

Johnson also visited Salter for about 30 minutes and checked his vitals, took down

his medications and informed him that the doctor would see him on March 3, 2010.

(Doc. 169-7, pp. 32, 34-35).  According to the nurse, Salter had no linens or blankets

and was in only his underwear and there was a sheet of paper taped to the door for

comments and for people to sign when they check on him. (Doc. 169-7, pp. 32-33).

According to Nurse Johnson, Salter appeared angry because he did not think he had

done anything wrong. Nurse Johnson had been told he was upset because they had

been unable to provide him with Lortab and Xanax, but when asked, Salter told her

he did not have any thoughts of hurting himself. (Doc. 169-7, pp. 35-36).  According

to the nurse, Salter remained on suicide watch on March 2, 2010, and the sheet

posted on Salter's door indicated the officers were observing the suicide watch

procedures. (Doc. 169-7, p. 47).  Salter was transferred to the isolation cell next to

the nurse's office and she could hear him hollering because he wanted his

medications. (Doc. 169-7, pp. 52-53).

The jail logs for March 1, 2010, reflect that at 3:52 p.m. Salter refused his

meal tray. (Doc. 184-7; Doc. 169-7, p. 52).

During his second day at the jail Salter had an incident where he "fell out"

and the nurse called his name and checked his pulse. (Doc. 169-21, p. 2; Doc. 169-7,

p. 46).  He responded to the nurse's touch but initially would not respond verbally.

(Doc. 169-21, p. 2; Doc. 169-7, p. 46).  Nurse Johnson believed Salter was faking. (Doc. 169-7, pp. 46-47).  After talking to the nurse, Salter recovered and returned to his bed.  At that time Salter had a blanket. (Doc. 169-21, p. 3; Doc. 169-7, p. 49). Nurse Johnson checked Salter later, at 11:30, and again at 1:00 p.m. and Salter appeared to be better. (Doc. 169-21, p. 3; Doc. 169-7, p. 49).  At 6:21 p.m. Salter was placed in a restraint chair by Officer Pate because Salter had been banging his head against the door. (Doc. 169-6, p. 90).

On March 3, 2010, at 12:42 p.m., Dr. West came to the jail and examined Salter.[3] (Doc. 169-1, pp. 103-104; Doc. 169-20, p. 2).  Nurse Johnson was present during Dr. West's examination. (Doc. 169-7, pp. 61-67).  Dr. West's notes on Salter's examination state that Salter was extremely depressed and agitated.  Dr. West also noted that around February 30, 2010, Salter had called the Sheriff's department and told them he was going to pull the trigger with a 30-30 in his mouth, but he did not go through with it.  Dr. West noted that Salter had apparently been seen by Mental Health around that time, but was not committed.  Salter reportedly told Dr. West that he had been "so down and out because of his inability to work and the fact that he could not carry out gainful employment to support himself."  Dr. West also noted that Salter "already had a charge before with suicidal tendencies and had been treated in Mobile at one of the Infirmary or Psychiatric places prior to this." Dr. West stated that he "had a long talk with [Salter] and we decided to go ahead

---

[3] Dr. West passed away before his deposition could be taken.

9

and treat him appropriately and keep him in isolation to watch."

> At that time he alleged to us that he was not suicidal or did not feel like he was going to harm himself.  At the same time, Monica Johnson, an LPN that works the jail every day, and I got in touch with Sean Klaetsch and he came over.  We were trying desperately to get him a commitment to Searcy to have him evaluated on that basis.  We were unable to pull this off.  His wife was hesitant to sign the petition to start with, but we told him that this was probably going to have to be done by her to institute this.  He should have been committed, in my opinion, on the day that he tried to commit his suicide with the gun before or the suicidal ideation and/or attempt.  Be that as it may, we will go ahead and begin to treat him.
>
> We had a long talk with him. He seemed to be appreciative.  He shook hands with me and thanked me.  Monica and I will watch him carefully.  We told him that we were not going to put him in the general population.  I informed him that I thought he should go to mental health treatment, Searcy, or wherever.  He started crying when I mentioned Searcy.  I told him this was not for a long term thing that this was just for a time to try to get his medicine straight and get him controlled.  He settled down.  He was smiling when he left the room area.  Monica is going to check him later with all of the follow up that we are doing.  I told him that I would truly recommend to him that he consider and that we consider getting him committed to Searcy.

(Doc. 169-21, pp. 4-5).  Dr. West's notes then concluded that they would continue

him on the medications he had been taking, but with lower dosages of Lortab and

Xanax.  Dr. West asserted they need to try to go through the right channels to get

him committed.  Lastly, Dr. West stated:

> The patient will be watched carefully.  We will check his vital signs and all of this.  Monica [Johnson] will watch him carefully as well as the CO's.

(Doc. 169-21, p. 6).  Nurse Johnson understood Dr. West to be saying that Salter did

not need to continue to be on suicide watch because he was not suicidal, but would

need to be watched. (Doc. 179-7, p. 68).  According to Nurse Johnson, Dr. West told her to take him off suicide watch. (Doc. 169-7, p. 69).  Salter was to be on "health watch" which is basically like suicide watch but he could have his belongings and he was to be watched for any medical issues. (Doc. 169-7, p. 73; Doc. 169-1, p. 73).  Dr. West told Nurse Johnson that Salter could be removed from suicide watch, he could be given back his clothes and his personal effects, but he needed to be watched because he may go through DTs. (Doc. 169-7, pp. 98-99, pp. 115-116).  Nurse Johnson told Administrator Mitchell and the correctional officers that Salter was to be removed from suicide watch. (Doc. 169-7, pp. 74, 84).

On health watch, corrections officers were to visually check inmates every fifteen to thirty minutes. (Doc. 169-2, pp. 131-132; Doc. 169-6, p. 115).  Corrections officers were not required to maintain a watch sheet on the cell door. (Doc. 169-1, p 101).

Salter could not be taken to Searcy or any other mental treatment center while he had criminal charges pending against him and he was in police custody. (Doc. 169-7, pp. 81-83).  Probate Court will not let a corrections officer or a law enforcement officer sign commitment papers; only mental health or the family could sign the commitment order.  No one signed Salter's bond to have him released, and because of his past, Detective Klaetsch, the arresting officer, was not comfortable recommending to the prosecutor that he be released on recognizance. (Doc. 169-15, ¶ 6; Doc. 169-1, p. 124; Doc. 169-13, pp. 68-71).  Klaetsch reported that his intent in

having federal charges placed on Mr. Salter was so that Salter could be mentally evaluated since neither Salter's family nor his counselor would sign a petition to get him help. (Doc. 169, ¶ 6). Salter's former employer offered to pay Salter's bond, but Brenda Salter called the jail and told them not to allow the bond to be signed because Kevin Bryant at Southwest Alabama Mental Health was going to get Salter committed. (Doc. 169-13, p. 71). Kevin Bryant reported that Dr. West contacted him while Salter was in jail to let him know how Salter was doing. (Doc. 169-12, p. 40). Bryant never came to the jail because he was told a petition was in the process of getting signed and no one asked him to come over and do a mental health consult on Mr. Salter. (Doc. 169-12, pp. 84-85). Ms. Salter had previously alerted Bryant that Mr. Salter was in jail, but agency policy is for the jail administrator to contact the local mental health center before they actually go over and assess someone. (Doc. 169-12, pp. 56-57). Southwest Alabama Mental Health reportedly does not have any policy that would prevent Bryant from visiting Salter at the jail. (Doc. 169-16, ¶ 5). Generally Kevin Bryant would be called to come do an assessment of an individual anytime an inmate exhibited strange behaviors or there were concerns that an inmate may have a mental illness or had previously been treated for a mental illness. (Doc. 169-12, p. 14). Southwest and their counselors, like Kevin Bryant, were the first line of people that would be contacted to respond to the jails and the hospitals for individuals that were mentally ill or could possibly be mentally ill. (Doc. 169-12, pp. 15-16).

 While incarcerated, Salter received and took the medications prescribed by

Dr. West. (Doc. 169-7, pp. 88-89). Dr. West periodically called Nurse Johnson to check on Salter and other things at the jail. (Doc. 169-7 pp. 97-98). The correctional officers would tell Johnson if Salter had been agitated, which was usually after he had talked to his wife and was told he wasn't getting out of jail. (Doc. 169-7, p. 96). Salter frequently asked for and received permission to call his wife. (Doc. 169-1, p. 122-123; Doc. 169-6, pp. 83-84; Doc. 169-13, p. 67). According to Ms. Salter, Mr. Salter never expressed that he was thinking of committing suicide during his phone calls to her. (Doc. 169-13, p. 83). One of the corrections officers, Officer Greg Harrelson, had been friends with Salter since high school and came to visit with and check on Salter at the beginning of each of his shifts and then come back to visit a total of six to eight times during his shift. (Doc. 169-8, pp. 5-8, 36-43).

On March 4, 2010, Salter told Nurse Johnson he felt like the walls were closing in on him. (Doc. 169-7, p. 89). According to Nurse Johnson, this was a common complaint among prisoners in isolation and suggested that Salter was claustrophobic. Nurse Johnson spoke with Captain Trent and with Dr. West's approval, made arrangement to periodically leave Salter's cell door open for twenty to thirty minutes at a time while jail staff was present. (Doc. 169-7, pp. 89-91).

On March 5, 2010, Salter complained of pain and acid reflux and Nurse Johnson gave him Zantac and Ibuprofen. (Doc. 169-7, p. 92). The jail log indicates that at 7:23 that morning Salter was lying on the floor and told Correction Officer Harrelson that ants were biting him. (Doc. 184-3, p. 1). Nurse Johnson spoke to

13

Salter about the ants, but found there were no ants biting him. (Doc. 169-7, p. 104). Nurse Johnson thinks Salter was being impatient and wanted the nurse to come because he was due to receive Lortab about 10 minutes after he complained of ant bites. (Doc. 169-7, pp. 105-106).  Johnson told Dr. West about the ant-biting incident when Dr. West called at lunch time. (Doc. 169-7, p. 105).

In the evening on March 7, 2010, Salter had an episode where he was on the floor and refused to speak. (Doc. 169-7, pp. 106-107).  Nurse Johnson thought the behavior was abnormal and might indicate suicidal tendency, but noted that he had done it previously. (Doc. 169-7, pp. 107-108).

Captain Trent generally checked on inmates and spoke to them when she arrived at her shift first thing in the morning and did not recall Salter ever talking about suicide or depression and did not see him appearing suicidal. (Doc. 169-6 pp. 87-89).  According to Trent, she never knew Salter to be agitated, upset, or emotional while at the jail. (Doc. 169-6, pp. 83-84).

On March 9, 2010, Defendant Trent finished her shift and left at 3:00 p.m., Defendant Alisha Pate was working as both a dispatcher and a corrections officer starting at 3:00 p.m. because the dispatcher who was supposed to work was out. (Doc. 169-6, p. 113; Doc. 169-1, pp. 96-97; Doc. 169-2, pp. 6-7, 10; Doc. 169-5, p. 8). According to the jail logs, there were three corrections officers on duty at that time with Pate: Wesley Booker, Larry Knight, and Justin Williamson. (Doc. 169-25, p. 2). The booking logs indicate that at 4:00 p.m. Pate was feeding the female inmates.

14

(Doc. 169-23, p. 2).  The Dispatch logs shows Pate leaving the dispatch room at 4:04 p.m. (Doc. 169-24, p. 2).  Pate recalls seeing Salter and speaking to him briefly as she passed out the food trays before going to pass out more food trays to the female inmates. (Doc. 169-5, p. 99).  At 4:13 p.m. Pate logs that she is leaving the dispatch room to collect the food trays. (Doc. 169-24, p. 2).  At 4:13 p.m. the control log shows that Corrections Officer Knight is escorting an inmate (who the log shows was present in the booking room at 3:58) to the B Dorm. (Doc. 169-25, p. 2).  At 4:17 p.m. an entry in the control log states that Salter tried to hang himself. (Doc. 169-25, p. 2).  EMS service records indicate EMS was notified and a unit was dispatched at 4:28 p.m. (Doc. 169-26, p. 2).  Pate reports that when she returned to collect food trays she saw Salter hanging from the top bunk with something white. (Doc. 169-5, pp. 102-103).  Pate called for Deputy Messer to come to booking and to call an ambulance. (Doc. 169-5, p. 106).  Deputy Messer saw Salter hanging from what looked like a bed sheet tied to the top bunk with his knees bent under him and not touching the floor. (Doc. 169-11, p. 25).  Messer grabbed Salter around the waist and picked him up to get the pressure off his neck and Pate cut the sheet with a knife and they laid him down. (Doc. 169-11, p. 25; Doc 169-5, pp. 106-107).  Nurse Johnson entered the cell and instructed the officers to put Salter on the floor so she could assess him. (Doc. 169-7, p. 110).  Johnson and Pate performed CPR until EMS arrived. (Doc. 169-7, pp. 113-114; Doc. 169-5, p. 108).

Another inmate hung himself at the Conecuh County Jail in January 2006, prior to Mitchell becoming the Administrator there. (Doc. 169-2, pp. 33-36).

15

Mitchell reports that he did not know anything about the incident. (Doc. 169-2, p. 36). At that time Defendant Shirley Trent served as Jail Administrator under Sheriff Tracy Hulsey (Doc. 169-6, p. 5).

## DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

See Anderson, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." Vega v. Invsco Group, Ltd., 2011 WL 2533755, *2 (11th Cir. 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice;

there must be enough of a showing that the jury could reasonably find for that

party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

"[T]he nonmoving party may avail itself of all facts and justifiable inferences in the

record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th

Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is no genuine issue for trial." Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal

quotation and citation omitted).

## B. Plaintiff's Claims

Plaintiff's Amended Complaint asserts three counts against the remaining

Defendants.[4] (Doc. 87).  Count I asserts a § 1983 claim that all defendants were

deliberately indifferent to Salter's serious mental health needs, thereby depriving

Salter of his rights as a pretrial detainee under the Fourteenth Amendment to the

Constitution of the United States. (Doc. 87, pp. 13-14).  Count II asserts a § 1983

claim against Sheriff Booker in his individual capacity based on his written policies,

customs or practices that resulted in the Defendants' deliberate indifference to

Salter's serious mental health needs. Count II further alleges that Booker failed to

properly staff, adequately hire, train, manage supervise, and instruct the staff

Defendants and failed to enforce the Conecuh County Detention Facility Standard

Operation Procedures.  Count IV asserts a state law wrongful death claim pursuant

---

[4] Counts III and V are asserted only against the City of Evergreen and Nurse
Johnson, who have been dismissed from this action. (Docs. 105, 141).

to ALA. CODE § 6-5-410 against the Defendants. Count IV has been dismissed against Defendants Booker and Boykin. (Doc. 105).

In their motion for summary judgment, Defendants contend that they are entitled to qualified immunity on the deliberate indifference claims. Defendants also assert that Mitchell, Brown and Pate are entitled to state-agent immunity on Plaintiff's wrongful death claim. The Court presumes that Defendants intended to claim state-agent immunity for Mitchell, Trent and Pate, since Brown and Pate are the same person and the wrongful death claim remains pending against all three.

### 1. Qualified Immunity

A government official who is sued in his or her individual capacity under § 1983 may seek summary judgment on the ground that he or she is entitled to qualified immunity. Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). As the Supreme Court explained, qualified immunity protects government officials performing discretionary functions from civil trial and liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citation omitted). "Qualified immunity gives government officials

19

breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Messerschmidt v. Millender, __ U.S. __, 132 S. Ct. 1235, 1244-45 (2012) (citations and internal quotations omitted).  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." Id. at 1245 (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee, 284 F.3d at 1194 (internal quotations omitted).  Once proven, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate" by demonstrating that the conduct violates a clearly established constitutional right. Id.   There appears to be no dispute that the Defendants here were acting within the scope of their "discretionary authority" as that term is defined under a qualified immunity analysis.  "[T]he determination that an officer was acting within his discretionary authority is quite a low hurdle to clear." Godby v. Montgomery Cty. Bd. of Educ., 996 F. Supp. 1390, 1401 (M.D. Ala. 1998).  "An official may show that an act was within his discretionary authority merely by showing that the acts (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Id. (internal quotations omitted, citing Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994)).  Here it is clear

that the Defendants were acting within the scope of their discretionary authority and Plaintiff has not argued otherwise.   Thus, the burden shifts to Plaintiff to show that qualified immunity is not appropriate. Lee, 284 F.3d at 1194.  Accordingly, the Court turns to whether there was a constitutional violation, in this case whether Defendants' actions were deliberately indifferent to a substantial risk of serious harm to Salter.

Under Saucier v. Katz, the "threshold question" is: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's [discretionary] conduct violated a constitutional right?" 533 U.S. 194, 201 (2001). Only if the answer to that question is affirmative may the court proceed to determine "whether the right was clearly established." Id.  A plaintiff can establish that a right was clearly established and provides notice or warning to officers that the conduct was unconstitutional by submitting fact-specific precedents, or demonstrating that the very conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent." Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002).  The Court notes that the two-step inquiry established in Saucier is no longer mandatory. Pearson v. Callahan, 555 U.S. 223, 236 (2009).  If no constitutional right was violated, the court need not inquire further. Id.  If, however, a constitutional violation occurred, the court must then determine whether the right was clearly established. Id.

Because Salter was a pretrial detainee, his § 1983 claims are based on the due process clause of the Fourteenth Amendment. <u>Cagle v. Sutherland</u>, 334 F.3d 980, 985 (11th Cir. 2003) (citing <u>Belcher v. City of Foley, Ala.</u>, 30 F.3d 1390, 1396 (11th Cir. 1994).   "[I]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under ... the ... fourteenth amendment, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life."  <u>Id.</u> at 986 (quoting <u>Edwards v. Gilbert</u>, 867 F.2d 1271, 1274–75 (11th Cir.1989).  "The deliberate indifference standard 'requires a *strong likelihood* rather than a mere possibility that the self-infliction of harm will occur.' " <u>Id.</u> (emphasis in original) (quoting <u>Popham v. City of Talladega</u>, 908 F.2d 1561, 1563 (11th Cir. 1990).  "[D]eliberate indifference describes a state of mind more blameworthy than negligence." <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976)).  It requires "more than ordinary lack of due care for the prisoner's interests or safety." <u>Id.</u> (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)).  However, deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." <u>Id.</u>  "[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." <u>Id.</u> at 836.  A prison official is deliberately indifferent only if:

> the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

and he must also draw the inference.

Id. at 837.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Id. at 838.  "To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had '(1) subjective knowledge of a risk of serious harm; [and] (2) disregard[ed] ... that risk; (3) by conduct that is more than mere negligence." Cagle, 334 F.3d at 987 (quoting McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)).

As to the second prong of the test, "[t]he law is clearly established that jail officials may not act with deliberate indifference to the risk of inmate suicide." Heggs v. Grant, 73 F.3d 317, 320 (11th Cir. 1996) (citing Edwards v. Gilbert, 867 F.2d 1271, 1274075 (11th Cir. 1989)).  Thus, if it is determined that there is sufficient evidence for a jury to find that Defendants' conduct displayed "deliberate indifference" to the risk of Salter's taking of his own life, then there is also sufficient evidence that the unlawfulness of the Defendants' conduct was readily apparent. "There can be no deliberate indifference to an inmate's safety, however, unless there was a 'strong likelihood, rather than a mere possibility, that suicide would result from a defendant's actions or inaction.' " Id. (quoting Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1540 (11th Cir. 1994)).  Defendants are "entitled to qualified immunity unless a reasonable officer in his position should have known under the circumstances then existing that [Salter] would most likely harm [him]self if [Defendants] did not take additional precautions to protect [him]. Id.

23

As to whether the defendants in the instant case subjectively knew there was a risk of serious harm, there is testimony that everyone at the jail knew of Salter's prior mental issues and suicidal tendencies. Salter had a record of mental health issues and had been arrested before and subsequently committed to a mental health facility. Less than two weeks before his suicide, Salter had called the Sheriff's Office saying he was going to kill himself with a gun. Salter even told the booking officer and the booking officer wrote in Salter's records that Salter was sometimes suicidal and had tried to kill himself in the past. Knowledge of prior suicide attempts, without more, do not establish that a defendant knew there was a strong likelihood of suicide. Holland v. City of Atmore, 168 F. Supp. 2d 1303, 1312 (S.D. Ala. 2001), aff'd, 37 F. App'x 505 (11th Cir. 2002). However, Salter's prior suicide attempts were as recent as two weeks before his suicide at the jail and some of Salter's behavior while in jail also indicated that he was having serious mental problems. The circumstances in this case are very different from those reported in the Holland case. In Holland, the arrestee had met with a mental health representative since his prior suicide attempts and it was reported that he had "resolved some issues" and had "decided to live." Id. at 1308. Holland was calm and cooperative and appeared to be a "different person" than he had been when he had attempted suicide several months prior. Id. Salter, on the other hand, had threatened or attempted suicide less than a week before he was taken to the jail and Salter continued to display alarming behavior while at the jail. In fact, prison personnel supported efforts to have Salter committed to a mental facility – which

indicates they recognized that Salter's mental issues were serious and continuing.

See Howell v. Evans, 922 F.2d 712, 716 (11th Cir. 1991), vacated pursuant to

settlement, 931 F.2d 711 (11th Cir. 1991), and opinion reinstated *sub nom*. Howell

v. Burden, 12 F.3d 190 (11th Cir. 1994) (finding that prison officials recognized the

inmate's condition was serious because they supported an application for a medical

release). As such, the Court finds there is sufficient evidence to indicate that the

risk that Salter would attempt to harm himself was, at least at some point during

his time at the jail, both serious and obvious. While a defendant who is unaware of

a risk cannot be held liable merely because the risk was obvious,[5] the Court finds

there is sufficient evidence from which a jury could find that each of the Defendants

here were aware that there was a serious risk that Salter would harm himself.

"Whether a prison official had the requisite knowledge of a substantial risk is a

question of fact subject to demonstration in the usual ways, including inference

from circumstantial evidence, and a factfinder may conclude that a prison official

knew of a substantial risk from the very fact that the risk was obvious." Farmer,

511 U.S. at 842 (citations omitted).

     Upon Salter's arrival at the jail, he was put in isolation and reportedly placed

on suicide watch. There is some question whether or not all suicide watch protocols

were followed, and there is evidence indicating Salter was given a blanket at some

---

[5] See Farmer, 511 U.S. at 841-42 ("we cannot accept petitioner's argument that
Canton[v. Harris, 489 U.S. 378 (1989)] compels the conclusion here that a prison
official who was unaware of a substantial risk of harm to an inmate may
nevertheless be held liable under the Eighth Amendment if the risk was obvious
and a reasonable prison official would have noticed it.").

point during his second day at the jail, in violation of the suicide watch policy.  It is unclear whether this disregard of the suicide prevention procedure was the result of negligence or indifference; however, no injury occurred while Salter was reportedly on suicide watch.  The injury complained of – Salter's suicide – occurred after he was taken off suicide watch and was instead placed on health watch.  During health watch prisoners are allowed to have bed linens and personal items, and it was while he was on health watch that Salter reportedly hung himself with a sheet.  Thus, the more important issue is whether Defendants were deliberately indifferent to Salter's safety by removing him from suicide watch and/or by failing to act appropriately or follow proper policy while Salter was on health watch.

Defendants contend that they placed Salter on health watch at the recommendation of Dr. West.  Plaintiff disputes whether Dr. West actually recommended that Salter be change to the less stringent health watch.  However Nurse Johnson testified that Dr. West recommended the switch to health watch and there is no contrary evidence.  Dr. West's notes are somewhat vague about the type of watch Salter was to be under, but are consistent with Nurse Johnson's conclusion and there is no testimony challenging her account.  More importantly, Nurse Johnson testified that she told Administrator Mitchell and the correctional officers that Dr. West had recommended that Salter be removed from suicide watch and all of the evidence indicates that the Defendants believed that Dr. West had recommended the switch.

26

Plaintiff contends that the Defendants should have known from Salter's behavior that he was still suicidal. Some of Salter's worrisome behavior occurred prior to Dr. West recommending that he be moved to health watch. However, some of the behavior occurred after he was moved to health watch, such as Salter complaining about feeling like the walls were closing in on him on March 4, complaining of ants biting him on March 5, and lying on the floor and refusing to speak on March 7. These behaviors were explained away by Nurse Johnson. For instance Salter's feeling that the walls were closing in was reportedly a common complaint from prisoners in isolation and was believed to merely indicate that he was claustrophobic. Salter's report that ants were biting him was thought to be a ploy to get the nurse there to give him his medication. Nurse Johnson admitted that Salter's lying on the floor and not speaking was an indicator that he might be suicidal, but it was similar to behavior Salter exhibited prior to Dr. West deciding that Salter was not suicidal. It is unclear what each of the Defendants thought of all of Salter's behavior. However, if not for their reliance on Nurse Johnson and Dr. West, there would clearly be sufficient evidence from which a jury could find that the Defendants were aware that there was a serious risk Salter was suicidal throughout his stay at the Conecuh County jail in March 2010.

Defendants cite several cases to support their contention that they cannot be held liable for administrative decisions that relied on the judgment of medical personnel. See e.g. Acosta v. Watts, 281 F. App'x 906, 908 (11th Cir. 2008) ("[A prison official] cannot be held liable for a constitutional tort when his

27

administrative decision was grounded in a decision made by medical personnel."
(citations omitted)); <u>Williams v. Limestone Cty., Ala.</u>, 198 F. App'x 893, 897 (11th
Cir. 2006) ("[S]upervisory officials are entitled to rely on medical judgments made
by medical professionals responsible for prisoner care." (citations omitted)); <u>Howell</u>,
922 F.2d at 723 ("We do not dispute [the prison official's] right to rely on medical
professionals for *clinical* determinations."); <u>Hancock v. Hood</u>, 686 F. Supp. 2d 1240,
1257 (S.D. Ala. 2010) (stating that neither this Court, nor the Sheriff should "be
required to substitute their medically untrained judgment for the professional
judgment of the medical health professionals who treated Hancock." (citations
omitted)); <u>Minton v. Spann</u>, 2007 WL 1099114, *21 (N.D. Fla. Apr. 10, 2007)
("Defendants … are not trained medical professionals and they are entitled to rely
upon the opinions of the doctors and nurses who are charged with providing medical
care to inmates.").  However, none of the cases cited by Defendants concerned
officials who had relied on a <u>medical</u> doctor's determination of an inmate's <u>mental</u>
health.  The testimony in this case indicates that the jail administrator and staff
always followed Dr. West's recommendation.  While this may have been the
common practice at the jail, "an official does not insulate his potential liability for
deliberately indifferent actions by instituting a policy of indifference." <u>Howell</u>, 922
F.2d at 723.  "Indeed, it is well established that an official's policy can violate the
constitution." <u>Id.</u> (citations omitted).  Additionally, there is evidence that
Defendants did not follow the known written policies of the jail, evincing a

disregard of any risk of harm to Salter.[6]  Alabama County Jail Standards and
Conecuh County's "Guidelines and Policy for Jail Administration and Procedures"
required that Salter be immediately referred to the local mental health agency, that
the referral be documented and that a face-to-face evaluation of the inmate be
requested by a mental health professional.  While there is evidence that Nurse
Johnson called mental health counselor Kevin Bryant, there is no documentation of
any referral to mental health and Kevin Bryant reports that he was not asked to
come to the jail to evaluate Salter.  There is evidence suggesting that the jail's
practice was to disregard the written policies and rely solely on the recommendation
of a medical doctor.  Defendants argue that a medical doctor was perhaps the more
appropriate expert since a medical doctor was necessary to prescribe medications
for Salter, but that does not alleviate any duty they have to have mental issues
assessed by a mental health professional when there is a serious risk to the inmate.
Where an inmate requires both mental and medical assistance to address serious
risks of harm, both a medical doctor and a mental health professional may be
required.

Defendants cite cases that they contend demonstrate that continuous
supervision is not constitutionally required and that suicidal inmates may be left
alone with a bed sheet if checked at regular intervals. See Popham v. City of
Talladega, 908 F.2d 1561, 1565 (11th Cir. 1990) ("Plaintiff … cites no cases for the

---

[6] The Court however notes that knowingly failing to follow their own policies does
not, *ipso facto,* demonstrate deliberate indifference, as their policies may be more
stringent than is constitutionally required.

proposition that deliberate indifference is demonstrated if prisoners are not seen by jailers at all times."); Williams v. Lee County, Ala., 78 F.3d 491 (11th Cir. 1996) (rejecting deliberate-indifference claim where inmate left alone with a bed sheet for 15 to 20 minutes soon after making a threat of suicide); Sanders v. Howze, 177 F.3d 1245 (11th Cir. 1999) (rejecting deliberate indifference where inmate, who had recently attempted suicide with a razor blade, was left alone with a bed sheet and visually monitored every 30 minutes).  However, in Popham, unlike the instant case, the prisoner was not known to have previously threatened or attempted suicide. Popham, 908 F.2d at 1564.

In Williams, the defendants had suicide prevention procedures in place and there was no suggestion that they failed to follow those procedures. Williams, 78 F.3d at 493.  The Williams Court found that the policies in that case were adequate and that hindsight clarity regarding steps that could have been taken are not enough to establish deliberate indifference. Id.  In the instant case however, there is evidence that defendants disregarded their written suicide prevention procedures. Defendants reportedly knew the policies were in place, but disregarded some of them as a matter of practice.  Even before Dr. West recommended that Salter be moved to health watch, Salter was given a blanket in violation of their suicide prevention policies.  Even if a policy requiring the removal of all bedding was not constitutionally required, Defendants' disregard of their suicide prevention policies may be evidence of indifference.

30

In <u>Sanders</u>, the Court found the plaintiff had not shown that binding, pre-existing case law existed at the time of the alleged violation "which so clearly established the parameters of the plaintiff's rights that the defendant must have been intentionally violating those right or must have been hopelessly incompetent. <u>Sanders</u>, 177 F.3d at 1251. The <u>Sanders</u> Court required the plaintiffs to "draw the court's attention toward a more particularized and fact-specific inquiry showing that there existed sufficient case law establishing the contours of their constitutional rights…" <u>Id.</u> at 1250. However, <u>Sanders</u> was decided prior to <u>Hope v. Pelzer</u>, which held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." 536 U.S. 730, 740-41 (2002). The Eleventh Circuit has acknowledged that, in <u>Hope</u>, it had been "chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations" and "cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration." <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1277 (11th Cir. 2004) (citing <u>Vaughan v. Cox</u>, 343 F.3d 1323, 1332 (11th Cir. 2003)). Additionally, the Court notes that in <u>Sanders</u> the prison officials were specifically advised by a doctor at Southwestern State Hospital, where they had taken Sanders for a psychological evaluation, "that absolutely no precautions were needed concerning Sanders, but that [the chief jailer] could implement whatever, if any, precautions he felt necessary." <u>Sanders</u>, 177 F.3d at 1247-48. The Chief Jailer, "out of an abundance of caution, ordered Sanders placed

31

in an isolation cell to keep him away from exposure to razor blades, pens, pencils, and other objects available in the open population of the jail." Id. at 1248. Thus, although the prison officials were advised by a mental health professional that had evaluated Sanders that no precautions needed to be taken, they took precautions anyway. Such facts demonstrate that the prison officials were not deliberately indifferent and are distinguishable from the facts in the instant case.

Defendants also cite Taylor v. Barkes, 135 S. Ct. 2042 (2015), to support their contention that Plaintiff has failed to show a violation of clearly established law. In Taylor, the Supreme Court stated that the right of an incarcerated person to the proper implementation of adequate suicide prevention protocols "was not clearly established in November 2004 in a way that placed beyond debate the unconstitutionality of the institution's procedures, as implemented by the medical contractor." Id. at 2045. However, the right at issue in Taylor was the right to be screened adequately for suicidal tendencies. The Taylor Court explained that the decisions relied upon by the lower court found that if officials know or should know of the particular vulnerability to suicide they have an obligation to not act with reckless indifference. Id. The Taylor Court concluded that case law did not hold "that detention facilities must implement procedures to identify such vulnerable inmates, let alone specify what procedures would suffice." Id. In the instant case, whether proper procedures were used to identify Salter's vulnerability to suicide is not the basis of plaintiff's claim. Whether the officials used adequate procedures to discover Salter's vulnerability to suicide is irrelevant if the Defendants were

actually aware that Salter had a particular vulnerability to suicide.  Thus, because the Court has found that there is sufficient evidence for a jury to find that Defendants were aware that Salter was at serious risk for suicide, the issue is whether it is clearly established that Salter had a right to not be treated with deliberate indifference to his serious risk of suicide.  As discussed previously, courts have found that jail officials may not display deliberate indifference to the risk of a prisoner's taking of his own life where the officials were subjectively aware that there was a strong likelihood that a self-inflicted harm would occur.  The Court finds that such right was clearly established.

Defendants assert that when you look at the knowledge and actions of each of the Defendants individually there is less evidence of deliberate indifference by any of the Defendants.  After reviewing the evidence, the Court finds there is sufficient evidence that the Defendants who work directly for the jail, Administrator Mitchell, Alicia Pate and Shirley Trent, were aware of a serious risk of harm to Salter and failed to provide sufficient measures to protect Salter.  However, Sheriff Booker and Chief Deputy Sheriff Boykin were not jail employees and did not have personal contact with Salter or actively participate in Salter's care during his time at the jail.

Plaintiff asserts that Booker and Boykin had supervisory responsibility for the jail, but "supervisory personnel cannot be held liable under section 1983 for the acts of their subordinates under the doctrine of respondeat superior." Greason v. Kemp, 891 F.2d 829, 836 (11th Cir. 1990) (citing Monell v. Department of Social

Servs., 436 U.S. 658, 691, (1978); Hewett v. Jarrard, 786 F.2d 1080, 1086 (11th Cir.1986)).  "[T]his, however, does not preclude an inquiry into whether the supervisors were independently liable under section 1983." Id.  "Supervisory liability lies where the defendant personally participates in the unconstitutional conduct or there is a causal connection between such conduct and the defendant's actions." Harper v. Lawrence Cty., Ala., 592 F.3d 1227, 1236 (11th Cir. 2010).  "There are three ways to establish such a causal connection:"

> when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy ... result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

Id. (quoting Cottone v. Jenne, 326 F.3d 1352, 1360–61 (11th Cir. 2003)).

Chief Deputy Boykin had knowledge of Salter's past behavior because of Salter's past interactions with the Sheriff's Office.  However, Boykin did not have any duties relating to the operation of the jail while Salter was there. (Doc. 169-4, pp. 13-16).  Boykin also had no responsibilities regarding the training of corrections officers or developing policies and procedures for the jail. (Doc. 169-4, pp. 91-92).  There is also no evidence that Boykin directed subordinates to act unlawfully or knew that the subordinates would act unlawfully.  There has been no culpable action or inaction attributed to Boykin.  Accordingly, the Court finds that summary judgment should be granted as to Chief Deputy Sheriff Tyrone Boykin.

34

As to Sheriff Booker, there is also no evidence that Booker personally interacted with or participated in Salter's care at the Conecuh County Jail in March 2010.  Plaintiff contends that the Conecuh County Sheriff's Department suicide prevention policies are faulty.  To support this contention Plaintiff provided the expert report of Lindsay Hayes who opined that the Sheriff's suicide prevention policies "were faulty and not robust." (Doc. 185-1, p. 11).  However, according to Hayes, "it was the custom and practice of jail administrator Wilbur Mitchell, shift supervisor and Captain Shirley Trent, and other staff to ignore the policy requirement of ensuring that suicidal inmates were assessed by a mental health professional" and it was this custom and practice that were proximate causes of Salter's suicide. (Doc. 185-1, pp. 11-12).  Hayes details the standards for suicide precautions outlined by the National Commission on Correction Health Care, but concedes that such standards "are generally not legally binding and do not set constitutional requirements," but instead "serve as guidelines or benchmarks in assessing duty of care or reasonable conduct.". (Doc. 185-1, pp. 16-17).  In other words, policies that are "faulty" for not meeting the guidelines may still pass constitutional muster.  In the instant case, Plaintiff has not shown that any deficiencies in the Sheriff Department's policies amounted to a violation of Salter's constitutional rights. See Williams, 78 F.3d at 493 ("We have found less formal means of suicide prevention than those of Lee County to pass constitutional muster. While Plaintiff's experts did testify from hindsight concerning steps that might have been taken to prevent Williams' suicide, 'these alleged weaknesses, without more,

do not amount to a showing of deliberate indifference ...' " (citations omitted)).  The evidence demonstrates that suicide prevention policies were promulgated and distributed to the jail staff for their use and Plaintiff's own expert opined that it was their failure to follow the policies that resulted in Salter's suicide, rather than the policies themselves.  There is no evidence indicating Sheriff Booker was deliberately indifferent.  Accordingly, the Court finds that summary judgment should be granted in favor of Elaine Stinson Booker as the administratrix for the Estate of Sheriff Edwin Booker.

However, as to Defendants Mitchell, Trent and Pate, the Court finds that, looking at the evidence in the light most favorable to Plaintiffs, there is a material question of fact whether each these Defendants were aware of and disregarded an excessive risk to Salter's health or safety.  Defendants' complete reliance on Dr. West in contravention of the written jail policies is disputable, especially in light of evidence of Salter's continued alarming behavior.  While there is evidence that the Defendants subjectively believed after receiving Dr. West's recommendation that there was no serious risk that Salter would commit suicide, there is also evidence suggesting that everyone at the jail believed Salter was and continued to be at serious risk for suicide.   The Court also finds that looking at the evidence in the light most favorable to Plaintiffs that there is sufficient evidence from which a jury could find that these Defendants acted with deliberate indifference when they failed to enforce or follow the written jail policies and procedures put in place to protect suicidal prisoners.

**2. State-Agent Immunity**

Defendants contend that Defendants Mitchell, Trent and Pate are entitled to state-agent immunity on Plaintiff's wrongful death claim.  In 1994, the Alabama Legislature enacted law providing immunity for law enforcement officers exercising discretionary authority in certain circumstances. ALA. CODE § 6-5-338(a) (1975). Section 6-5-338(a) provides:

> Every peace officer … who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof … shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Later on, the Alabama Supreme Court explained that "'[t]he restatement of State-agent immunity as set out by this court in <u>Ex parte Cranman</u>, [792 So. 2d 392 (Ala. 2000)], governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a).'"  <u>Ex parte City of Midfield</u>, 161 So. 3d 1158, 1163 (Ala. 2014) (quoting <u>Ex parte City of Tuskegee</u>, 932 So. 2d 895, 904 (Ala. 2005)) (alteration in original).  <u>Cranman</u> outlined the test for State-agent immunity, in pertinent part, as follows:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> * * * *
>
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the

37

duties in that manner; or
 (4) exercising judgment in the enforcement of the criminal laws of the
State, including, but not limited to, law-enforcement officers' arresting
or attempting to arrest persons, [or serving as peace officers under
circumstances entitling such officers to immunity pursuant to § 6-5-
338(a), Ala. Code 1975]

Cranman, 792 So. 2d at 405 (adding language in brackets modified by Hollis v. City

of Brighton, 950 So.2d 300, 309 (Ala. 2006).  However, a police officer's immunity is

not without its limits.  Section 6-5-388(a) has two exceptions:

> When the Constitution or law of the United States, or the Constitution
> of this State, or law, rules, or regulations of this State enacted or
> promulgated for the purposes of regulating the activities of a
> government agency require otherwise; or
>
> When the State agent acts willfully, maliciously, fraudulently, in bad
> faith, beyond his or her authority, or under a mistaken interpretation
> of the law.

Id.  Much like the federal analysis of qualified immunity, the officer bears the

original burden of proving that a "plaintiff's claims arise from a function that would

entitle the [officer] to immunity," a discretionary action.  Ex parte City of

Montgomery, 99 So. 3d 282, 293 (Ala. 2012).  The Alabama Supreme Court has

concluded that "Categories (3) and (4) of that restatement are clearly broad enough

to contemplate the *confinement of prisoners*, which is the conduct in controversy

here. Howard v. City of Atmore, 887 So. 2d 201, 206 (Ala. 2003) (emphasis in

original).  Once this initial burden is met, the burden shifts to the Plaintiff to show

that an exception applies.  Ex parte Kennedy, 992 So.2d 1276, 1283 (Ala. 2008).

Plaintiffs contend that Defendants acted beyond their authority.  An officer "acts

38

beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.' " Giambrone v. Douglas, 874 So.2d 1046, 1052 (Ala. 2003) (quoting Ex parte Butts, 775 So.2d 173, 178 (Ala. 2000)).  Police Officers have been found to act beyond their authority when they violate a police department's policy manual that addresses the particular situations.  Morton v. Kirkwood, 707 F.3d 1276, 1285 (11th Cir. 2013) (citations omitted)).  In the instant case, there is evidence that the Defendants violated written jail policies that addressed the particular situations.

Defendants claim the exceptions to state-agent immunity do not apply because their actions were not willful or malicious and instead were, at most, negligent.  However, Plaintiffs cite cases where officers were sued for negligence and immunity was denied because the defendant violated written policies. See Ex parte Yancey, 8 So.3d 299, 306 (Ala. 2008); Walker v. City of Huntsville, 62 So.3d 474, 498 (Ala. 2010); Morten v. Kirkwood, 707 F.3d 1276 (11th Cir. 2013).  The Cranman test exceptions do not require intentional acts.  Cranman denies immunity where an officer acted beyond his authority, as the Defendants in this case are alleged to have done.   Accordingly, the Court finds that Defendants are not entitled to state-agent immunity.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment (Doc. 167), is **GRANTED IN PART** to the extent that summary judgment is

39

granted in favor of **Defendants Chief Deputy Sheriff Tyrone Boykin** and **Elaine Stinson Booker as the administratrix for the Estate of Sheriff Edwin Booker**.  Defendants' motion for summary judgment is **DENIED** as to **Wilbur Mitchell, Shirley Trent** and **Alisha Pate**.

   **DONE and ORDERED** this 29th day of June, 2016.

 /s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE